

———————————

No. 3:23-CV-126-CWR-ASH

DESMOND D. GREEN,

*Plaintiff,*

*v.*

DETECTIVE JACQUELYN THOMAS, ET AL.,

*Defendants.*

———————————

ORDER DENYING QUALIFIED IMMUNITY

———————————

Before CARLTON W. REEVES, *District Judge.*

For nearly two years, the State of Mississippi falsely accused Desmond Green of capital murder. A detective used a lying, drug-impaired jailhouse informant to lock Green up. The detective also steered the informant to select Green's face from a photo lineup. It was a horrifying wrong.

Compounding Green's suffering was another horror. The jail he was held in was full of violence, rodents, and moldy food. He says there was "constant yelling, fighting, and threats."

Green "often did not have a mattress, or even a pad, to sleep on, and slept on the floor." He "constantly feared for his life."

The informant eventually recanted. The State then dropped the charges. But the ordeal cost Green almost two years of his life.

Green filed this lawsuit to seek justice for those two wrongs—his prosecution and conditions of confinement. He has sued the detective who locked him up, her employer (the City of Jackson, Mississippi), and the operator of the Hinds County Detention Center (Hinds County, Mississippi).

Green is now on the precipice of being wronged a third time. Not by a rogue officer or jailer, but by the law itself. Because the detective says the legal doctrine of qualified immunity requires the Court to dismiss Green's claims against her.

Qualified immunity was invented by the Supreme Court in 1967. In plain English, it means persons wronged by government agents cannot sue those agents unless the Supreme Court previously found substantially the same acts to be unconstitutional. *See Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015). A cynic might say that with qualified immunity, government agents are at liberty to violate your constitutional rights *as long as they do so in a novel way*.[1]

Most plaintiffs in this situation argue that the officer that wronged them isn't entitled to qualified immunity. Green does that. Unlike others, though, he has taken the next step and argued that qualified immunity is itself unlawful. He joins lawyers, professors, judges, and even Supreme Court

---

[1] It's actually worse. *See infra* p. 46 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 n.8 (2018)).

Justices who have called for the doctrine's re-evaluation, if not its abolition.

The Court agrees with these calls for change. Congress's intent to protect citizens from government abuse cannot be overridden by judges who think they know better. As a doctrine that defies this basic principle, qualified immunity is an unconstitutional error. It is past time for the judiciary to correct this mistake.

The Court presents Green's allegations, the governing legal standards, and the substantive case law below. It concludes that the detective is not entitled to qualified immunity. Her actions violated clearly-established law. Even if this were not the case, the detective's quest would fail. For qualified immunity has no basis in law. It is an extra-constitutional affront to other cherished values of our democracy.

The detective's motion to dismiss is therefore denied.

## I.  Factual and Procedural History

The following allegations are drawn from Green's complaint, its attachments, and the documents it references. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). At this stage of litigation, his allegations must be taken as true. *Id.* at 634.

On February 13, 2020, someone shot Nicholas Robertson in Jackson, Mississippi. A wounded Robertson knocked on the door of Avery Forbes. The police report says Robertson was conscious and spoke to Forbes. By the time the police arrived, however, Robertson was unresponsive. He died in Forbes' home.

Two months later, law enforcement arrested Samuel Jennings for burglary and grand larceny. He was jailed at the Hinds County Detention Center. While there, Jennings provided a statement about the Robertson murder to Jackson Police Department (JPD) Detective Jacquelyn Thomas.

Jennings handwrote his statement on a JPD form. It read,

> *I had gotten out the hospital and was laying in the bed back in the Shed Desmond green [undecipherable] had walked in not know i was in there and started aplozing for what had happen to twon about him shooting Nick Robertson said him and Chris Martin and Brandon Simrall had took body from thresa to flower and dropped of the body Desmond green told me out Loud he shot nick Robertson (bubba)*
>
> *Samuel Jennings*
>
> *4-10-20*

Jennings and Detective Thomas signed the statement.[2]

The accusation came as a surprise to Green. He says he didn't know Robertson, much less shoot him and move his body. With this uncorroborated statement, however, in July 2020 Detective Thomas and local prosecutors got a grand jury to indict Green for capital murder.[3]

---

[2] Part of Jennings' signature block is redacted. We do not know why.

[3] Because grand jury proceedings are secret, "allegations about what was presented or omitted in the grand jury room will in some sense be speculative." *Wilson v. Stroman*, 33 F.4th 202, 212 (5th Cir. 2022). This reality is discussed in detail below.

4

Green was arrested and detained in the Hinds County Detention Center. He remained there, awaiting trial, in an "inhumane" facility he claims was infested with rodents and snakes, where his cell mate was stabbed, where his food was moldy and stale, where he often had to sleep on the cell floor, and where he lived amidst constant violence, yelling, fighting, and fear. More than a year passed.

Jennings finally recanted in March 2022. He told public defenders and their investigator that he was drug-impaired when he accused Green of murder. He admitted that his statement was baseless, blamed his lie on meth abuse, and said he didn't know who killed Robertson.

A written statement memorialized Jennings' recantation. In it, Jennings swore under oath that he "never heard desmond" confess to murder. "I was just high and try to help myself get out of jail," he wrote. Jennings added, "I had origacally picked Photo 1 top left corner but the detectvive pointed to the 5th photo of lineup witch is bottom row middle photo but I didnt hear or know anything about this charge."

Jennings repeated this to members of the Hinds County District Attorney's Office the next month. He said he had taken "1½ shots" or "80-90 units" of meth shortly before he gave Detective Thomas the April 2020 statement.[4] He knew nothing about Robertson's murder and did not remember what he

---

[4] Jennings' drug habits are unknown, but his statement is consistent with using a 50ml syringe to inject meth one and one-half times. The record does not yet show what effect intravenous delivery of that amount of meth would have on a person, whether it resulted in visible marks on Jennings' body that Detective Thomas would have seen, or whether the detective otherwise knew or reasonably should have known of Jennings' drug use.

5

told the detective. Jennings added that he was in the hospital the day of the murder and suffers from a variety of mental health disorders.[5]

On April 14, 2022, the prosecutor moved to "remand" Green's case.[6] The State was "unable to meet its burden of proof."[7] The prosecutor attached Jennings' written recantation.

The presiding judge granted the motion and dismissed the case on April 21, 2022. Green was released from jail. He had been incarcerated in the Hinds County Detention Center for 22 months.[8]

This lawsuit followed in February 2023. In it, Green claims that Detective Thomas violated his rights under the Fourth Amendment, the Fourteenth Amendment, and Mississippi law to be free from "malicious prosecution and malicious

---

[5] Again, we do not know whether Detective Thomas knew or reasonably should have known that Jennings suffered from mental health disorders. The issue will be explored during discovery.

[6] That is a formal way of saying the prosecution wanted to abandon the case.

[7] The motion to remand suggests that Jennings may have given statements to law enforcement in February _and_ April 2020. _See_ Docket No. 1-1. Green's pleading, however, refers to only one statement—the one Jennings made on April 10, 2020. The Court does not know the truth of the matter, but for present purposes must adopt Green's version of events.

[8] Green's complaint says he was incarcerated for two years and three months, but July 2020 to April 2022 is under two years. The parties may clarify the exact timeline in discovery.

arrest without probable cause."[9] Green says the detective withheld crucial evidence from the grand jury, including the police report stating that Robertson was conscious when he arrived at the Forbes residence, information that the informant was unreliable (as an addict and a criminal), and other police evidence indicating that Robertson had been with a man named Brandon Summerall (rather than Green) "shortly before" the shooting. Green attached to his complaint the informant's sworn statement about Detective Thomas manipulating the photo lineup.

As for the detective's employer, Green says the City of Jackson is liable for an unconstitutional custom or practice of failing to train its officers on probable cause and how to corroborate informants' statements. He says that custom or policy caused his injuries.

Green then claims Hinds County is liable for subjecting him to unconstitutional conditions of confinement. He observes that during his detention, the Hinds County Detention Center was under a federal Consent Decree that sought to address persistent understaffing and conditions deficiencies. *United States v. Hinds Cnty.*, No. 3:16-CV-489-CWR-RHWR, 2021 WL 5501442 (S.D. Miss. Nov. 23, 2021). All of Green's constitutional claims are brought by way of 42 U.S.C. § 1983.

---

[9] In Mississippi, the tort of "malicious arrest" is now called "false arrest." *City of Mound Bayou v. Johnson*, 562 So. 2d 1212, 1219 (Miss. 1990). Green later withdrew this state-law claim. Docket No. 18 at 13.

Now before the Court is Detective Thomas's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[10] She says qualified immunity protects her from this suit.

## II.   Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"On a Rule 12(b)(6) motion, a district court generally must limit itself to the contents of the pleadings, including attachments thereto." *Brand Coupon Network*, 748 F.3d at 635 (quotation marks and citation omitted). "The court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims." *Id.* (citations omitted).

Ultimately, the Court's task "is to determine whether the plaintiff has stated a legally cognizable claim . . . , *not to evaluate the plaintiff's likelihood of success.*" *In re McCoy*, 666 F.3d 924, 926 (5th Cir. 2012) (citation omitted and emphasis added). Thus, the Court must accept all well-pleaded factual allegations as true and draw reasonable inferences in favor of the plaintiff. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

---

[10] The City of Jackson and Hinds County have also filed Rule 12 motions. Those will be taken up separately.

This same pleading standard applies to motions to dismiss based on qualified immunity. *See Terwilliger v. Reyna*, 4 F.4th 270, 279-80 (5th Cir. 2021).

### III.      The Ku Klux Klan Act and Qualified Immunity

#### A.      The Origins of the Statute

After the Civil War, white supremacists unleashed waves of terrorism across the South. *See* Eric Foner, Reconstruction: America's Unfinished Revolution 1863-1877 (1988); Nicholas Lemann, Redemption: The Last Battle of the Civil War (2006). Lawlessness was the order of the day. *Pierson v. Ray*, 386 U.S. 547, 559 (1967) (Douglas, J., dissenting). Groups like the Ku Klux Klan carried out "thousands of beatings, lynchings, and incidents of torture and mutilation." Robin D. Barnes, *Blue by Day and White by (k)night: Regulating the Political Affiliations of Law Enforcement and Military Personnel*, 81 Iowa L. Rev. 1079, 1099 (1996). "These atrocities were inflicted with impunity because judges, politicians, and law enforcement officers were fellow Klansmen and loyal sympathizers." *Id.* White supremacy empowered them to kill Black men, women, and children without fear of consequences. *See* Tiffany R. Wright et al., *Truth and Reconciliation: The Ku Klux Klan Hearings of 1871 and the Genesis of Section 1983*, 126 Dickinson L. Rev. 685, 690-92, 702 (2022).

Congress responded with the Ku Klux Klan Act of 1871. *See Monroe v. Pape*, 365 U.S. 167, 172 (1961). It wanted "to provide a remedy for the wrongs being perpetrated" on Black folk. *Pierson*, 386 U.S. at 559 (Douglas, J., dissenting).

The Ku Klux Klan Act imposes liability upon any person who, acting under color of state law, deprives another of a federal

right. *See* 42 U.S.C. § 1983.[11] In other words, the statute guarantees "basic federal rights of individuals against incursions by state power." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 503 (1982).

Because the law is codified at 42 U.S.C. § 1983—and because lawyers usually shy away from saying Ku Klux Klan—this law is often referred to as "Section 1983." This Court will refer to the law by its formal name as a reminder of why the Reconstruction Congress saw the need to enact it.

A person seeking damages for a constitutional violation does not have to cite or quote the Ku Klux Klan Act to get in the courthouse door. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). Federal procedure is not that stingy. Whenever a person brings a constitutional claim, though, they invoke the Ku Klux Klan Act's authority. The statute is how Congress chose "to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 700-01 (1978).

The "very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (quotation marks and citation omitted).[12]

---

[11] "Liability" in this context means "damages," which is a formal way of saying *money*. This remedy "has coexisted with our constitutional system since the dawn of the Republic." *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020).

[12] Readers may be familiar with accounts of police officers and sheriff's deputies joining forces with the Klan to terrorize Black citizens. State

The Ku Klux Klan Act "established a new legal order that contemplated direct federal intervention in what had been considered to be state affairs, a system in which federal courts were to enforce newly created federal constitutional rights against state officials through civil remedies and criminal sanctions." Katherine A. Macfarlane, *Accelerated Civil Rights Settlements in the Shadow of Section 1983*, 2018 Utah L. Rev. 639, 660 (2018) (quotation marks and citation omitted).

## B.       The Invention of Qualified Immunity

The Ku Klux Klan Act created "a species of tort liability that on its face admits of no immunities." *Wyatt v. Cole*, 504 U.S. 158, 163 (1992) (quotation marks and citation omitted). It had "no exceptions" for government officers who violated federal law in purported good faith. Patrick Jaicomo & Anya Bidwell, *Recalibrating Qualified Immunity: How* Tanzin v. Tanvir, Taylor v. Riojas, *and* McCoy v. Alamu *Signal the Supreme Court's Discomfort With the Doctrine of Qualified Immunity*, 112 J. Crim. L. & Criminology 105, 119 (2022). Rather, "the historical rule of strict liability continued." *Id.*

The Supreme Court explained why in 1882:

> No man in this country is so high that he is
> above the law. No officer of the law may set that
> law at defiance with impunity. All the officers
> of the government, from the highest to the low-
> est, are creatures of the law and are bound to
> obey it. It is the only supreme power in our

---

judicial officials too enabled the savage violence. "[S]tate courts left the terrorism committed by various white militant groups seeking control in the South unchecked. . . . Local magistrates, judges, and grand juries refused or failed to act." Wright et al., 126 Dickinson L. Rev. at 701-02.

> system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

*United States v. Lee*, 106 U.S. 196, 220 (1882). In the decades to follow, the Supreme Court did not recognize good-faith immunity as a defense to suit. *See Baxter v. Bracey*, 140 S. Ct. 1862, 1863 (2020) (Thomas, J., dissenting from the denial of certiorari).

That all changed in *Pierson v. Ray*, a case arising out of Jim Crow Mississippi.

In *Pierson*, police officers in Jackson arrested and jailed peaceful ministers who entered a "White Only" waiting room in a bus terminal. 386 U.S. at 552-53. The ministers eventually beat the bogus criminal charges in Mississippi state court, then sued the police officers in federal court for violating their constitutional rights, as guaranteed by the Ku Klux Klan Act.

On appeal, the Supreme Court decided that the police officers could assert a form of immunity—a "[]qualified immunity"—by claiming that they acted in good faith when they arrested the ministers to prevent violence. *Id.* at 555. The Justices derived this immunity from good-faith and probable-cause defenses available to officers facing common law claims.

This was a strange conclusion, historically-speaking. Again, "lawsuits against officials for constitutional violations did not generally permit a good-faith defense during the early years of the Republic" or in the decades after the Ku Klux Klan Act. William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L.

Rev. 45, 55, 57 (2018). In addition, "to the limited extent a good-faith defense did exist in some common-law suits, it was part of the elements of a common-law tort, not a general immunity." *Id.* at 55. Yet the Court "either ignored or misstated this history." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 241 (2022).

*Pierson* was strange factually, too. The officers had no proof that the ministers were a threat to public safety. The true threat came from the menacing crowd of 25 to 30 bystanders "in a very dissatisfied and ugly mood," "mumbling and making unspecified threatening gestures," and "threatening violence." *Pierson*, 386 U.S. at 553. The officers never even claimed a good faith belief that the ministers had violated the law. *Id.* at 557. It was as if the officers had arrived at a hostage situation, protected the kidnappers, and arrested the hostages.[13]

And *Pierson* was strange legally, if you step back and consider it from a distance. The Justices took a law meant to protect freed people exercising their federal rights in Southern states after the Civil War, then flipped its meaning. In creating qualified immunity, the high Court protected the Southern

---

[13] This even happens today. In one recent case, police officers in Texas arrived at the scene of a car crash, let the drunk driver go, arrested the Good Samaritan who called 911, and charged the Good Samaritan with a felony. *Hughes v. Garcia*, --- F.4th ---, No. 22-20621, 2024 WL 1952868, at *1 (5th Cir. May 3, 2024). The Fifth Circuit was horrified. It thought it "insan[e]" and irrational[]" that the police officers sought qualified immunity for such "obviously" unlawful conduct, and expressed astonishment that their lawyers defended them. *Id.* at *1 and *10. But it is not clear that the Texas officers did anything *that* different from the Mississippi officers who arrested and jailed the ministers in *Pierson v. Ray*.

officials still violating those federal rights 100 years after the War ended. Southern trees bear strange fruit, indeed.

It is difficult to see qualified immunity's creation as anything other than a backlash to the Civil Rights Movement. Yet even as America has incorporated the lessons of that Movement into its dominant narrative—that of American progress—the law has retained this vestige. Since the 1960s, in fact, the Supreme Court has continued to shape, enforce, and expand qualified immunity, making it almost impossible to overcome.

## C.    Modern Qualified Immunity

Today, "[t]he doctrine of qualified immunity protects public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (quotation marks and citation omitted). It is supposed to "balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

When a defendant asserts qualified immunity, the burden shifts to the plaintiff, who must overcome the defense. *See Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012). To do so at the motion to dismiss stage, the plaintiff must allege "that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."

*Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) (quotation marks and citation omitted).

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Mullenix*, 577 U.S. at 11-12 (cleaned up).

The "clearly established" requirement is unusual in the law. Other torts don't require it. If a surgeon accidentally leaves a sponge in your abdomen before stitching you up, you do not have to point to an existing appellate decision "clearly establishing" his error before proceeding with your claim. You simply state the facts and explain that the surgeon's conduct fell below the standard of care.

The clearly established requirement is nevertheless the governing standard in constitutional torts. Under this standard,

- Courts let correctional officers hold a person for six days in a frigid cell, covered in other persons' feces and forced to sleep naked in sewage, because it was only clearly established "that prisoners couldn't be housed in cells teeming with human waste for *months*

15

on end." *Taylor v. Stevens*, 946 F.3d 211, 222 (5th Cir. 2019) (emphasis added).[14]

- Courts let police officers steal $225,000 in cash and rare coins. *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019). Although that was "morally wrong," the officers "did not have clear notice that it violated the Fourth Amendment." *Id.* at 942.

- Courts let correctional officers spray *some* chemical agent in a person's face "for no reason at all," because it was only clearly established that guards could not use "the *full* can of spray." *McCoy v. Alamu*, 950 F.3d 226, 232-33 (5th Cir. 2020).

- Courts let police officers who were *inside* a car kill a person who didn't warrant lethal force. The law clearly established only that an officer could not shoot a person from *outside* a car. *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 675 (6th Cir. 2020).

---

[14] After media scrutiny, the Supreme Court reversed. *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam). The Justices thought "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." *Id.* at 8-9. The fact remains that the first four federal judges to hear Mr. Taylor's case all concluded that the correctional officers were entitled to qualified immunity. Equally sad is that the lower courts denied Mr. Taylor's plea to have a lawyer appointed to help him. The Court of Appeals found that Mr. Taylor's case did "not present exceptional circumstances requiring appointment of counsel." *Taylor v. Stevens*, 707 F. App'x 280, 281 (5th Cir. 2017).

16

- A court let five police officers shoot a man 22 times as he lay motionless on the ground, after tasing him four times, kicking him, and placing him in a chokehold. *Estate of Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 663-64 (4th Cir. 2020). It was not clearly established that officers could not shoot a motionless person who possessed a knife. *Estate of Jones v. City of Martinsburg, W. Va.*, No. 3:13-CV-68, 2018 WL 4289325, at *5 (N.D.W. Va. Sept. 7, 2018).

- Courts let a correctional officer watch a suicidal detainee strangle himself to death with a telephone cord, after officials placed him in the cell, with the cord, knowing he was unstable and had repeatedly attempted suicide. *Cope v. Cogdill*, 3 F.4th 198, 202-03 (5th Cir. 2021). It was not clearly established that correctional officers who watch a person attempt suicide had to "call for emergency medical assistance." *Id.* at 209.

- And a court let a deputy sheriff shoot a 10-year-old child (from 18 inches away) while the deputy repeatedly tried to shoot a non-threatening family dog. *Corbitt v. Vickers*, 929 F.3d 1304, 1308 (11th Cir. 2019). No prior decision "clearly established" that act as unconstitutional. *Id.* at 1315.

These are just a handful of the cases demonstrating how a "lack of precisely-analogous controlling law can oftentimes sound the death knell to a § 1983 claim." *Stewart*, 970 F.3d at 681 (Donald, J., concurring in part and dissenting in part).

17

Such "thin distinctions . . . allow officers to evade accounta-
bility for excessive abuses, including killing people." Osagie
K. Obasogie & Anna Zaret, *Plainly Incompetent: How Qualified
Immunity Became an Exculpatory Doctrine of Police Excessive
Force*, 170 U. Pa. L. Rev. 407, 412 (2022) (collecting cases). And
we know which people disproportionately bear the brunt of
the doctrine.

### D.    Qualified Immunity's Racial Consequences

Qualified immunity has obvious economic consequences. It
discourages victims of misconduct from bringing lawsuits,
and those who do file suit sometimes recover nothing because
of it. Qualified immunity accomplishes this by preventing vic-
tims of government misconduct from using the discovery
tools available to other litigants. *See Carswell v. Camp*, 54 F.4th
307, 312-13 (5th Cir. 2022).

Another obvious consequence of qualified immunity, though,
is a perpetuation of racial inequality.

18

Research indicates that Black Americans are pulled over more often,[15] searched more often,[16] arrested more often,[17] imprisoned more often,[18] wrongfully convicted more often,[19] and killed by law enforcement more often than other Americans.[20,21] Qualified immunity then bars many of these

---

[15] Emma Pierson et al., *A large-scale analysis of racial disparities in police stops across the United States*, 4 Nature Hum. Behav. 736, 737 (2020).

[16] *Id.* at 739 ("In these jurisdictions, stopped black and Hispanic drivers were searched about twice as often as stopped white drivers."); *see also* Sharad Goel & Cheryl Phillips, *Police Data Suggests Black and Hispanic Drivers are Searched More Often Than Whites*, Slate (June 19, 2017) ("Turning to the data, we found that searches of Hispanic drivers yield contraband at lower rates than searches of whites, and that searches of black drivers yield contraband at similar rates to searches of whites.").

[17] Lauren Nichol Gase et al., *Understanding Racial and Ethnic Disparities in Arrest: The Role of Individual, Home, School, and Community Characteristics*, 8 Race Soc. Probl. 296 at PDF pp.10-11 (2016).

[18] William J. Sabol et al., *Justice Systems Disparities: Black-White National Imprisonment Trends, 2000 to 2020* (Council on Crim. Just. Sept. 2022) ("in 2020, Black adults were imprisoned at 4.9 times the rate of White adults").

[19] Samuel R. Gross et al., *Race and Wrongful Convictions in the United States 2022*, Nat'l Registry of Exonerations (Sept. 2022) ("Judging from exonerations, innocent Black Americans are seven times more likely than white Americans to be falsely convicted of serious crimes.").

[20] Jeffrey Fagan & Alexis D. Campbell, *Race and Reasonableness in Police Killings*, 100 B.U. L. Rev. 951, 961 (2020) ("Black suspects are more than twice as likely to be killed by police than are suspects from other racial or ethnic groups, including shootings where there are no obvious reasonable circumstances.").

[21] Additionally, it is well-established that defendants are more likely to be sentenced to death if their murder victim was white. *See* Scott Phillips & Justin Marceau, *Whom the State Kills*, 55 Harv. C.R.-C.L. L. Rev. 585, 587 (2020); *McCleskey v. Kemp*, 481 U.S. 279, 287 (1987). New research indicates

individuals from securing justice, "shut[ting] the courthouse doors on a large portion of those black and brown citizens who plausibly allege that police officers targeted, surveilled, or stopped them because of their race." *Bey v. Falk*, 946 F.3d 304, 331 (6th Cir. 2019) (Clay, J., dissenting). America's "long history of racism . . . is unavoidably and inextricably enshrined in the doctrine." Katherine Enright & Amanda Geary, *Qualified Immunity and the Colorblindness Fallacy: Why "Black Lives [Don't] Matter" to the Country's Highest Court*, 13 Geo. J. of L. & Mod. Critical Race Persps. 135, 140 (2021).

With that essential background, the Court turns to analyze Green's causes of action.

## IV.    Discussion

Green's claims occasionally share elements or have overlapping analyses. For example, a lack of probable cause supports a Mississippi malicious prosecution claim, a Fourth Amendment malicious prosecution claim, and a Fourth Amendment false arrest claim. The same is sometimes true for Detective Thomas's defenses. She has invoked the "independent intermediary" doctrine as a defense to all of Green's claims.

The Court will do its best to analyze each claim and defense without unnecessary repetition.

### A.    State Law Malicious Prosecution Claim

The discussion begins with Green's malicious prosecution claim. Both parties identify essentially the same six elements of malicious prosecution under Mississippi law:

---

that Black people on death row even suffer a "botched execution" more than twice as often as white people. Reprieve, *Lethal injection in the modern era: cruel, unusual and racist* at 4 (April 2024).

> (1) the institution of a criminal proceeding; (2) by, or at the instance of, the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceeding; (5) want of probable cause for the proceeding; and (6) the plaintiff's suffering of injury or damage as a result of the prosecution.

*Univ. of Miss. Med. Ctr. v. Oliver*, 235 So. 3d 75, 83 (Miss. 2017) (quotation marks and citation omitted).

The parties agree that Detective Thomas caused criminal proceedings against Green; that those proceedings ended in Green's favor; and that Green was injured. They dispute elements (4) and (5): malice and want of probable cause. Each will be considered in turn.

### 1.      Malice

Detective Thomas says Green has not met the "high bar" required to prove malice. Docket No. 10 at 10 (quoting *Oliver*, 235 So. 2d at 83). She argues that malice requires the defendant to have instigated the proceedings for "private advantage" such as extortion, debt collection, witness intimidation, and the like. *Id.*

A review of her supporting case does not bear this out. *Oliver* indicates that while one can certainly prove malice with evidence of such intentions, the list is merely illustrative. It does not establish the threshold for establishing malice.

Detective Thomas is on firmer footing when she argues that the malice element requires proof that the defendant instituted the prosecution "primarily for a purpose other than that of bringing an offender to justice." *Oliver*, 235 So. 3d at 83 (quotation marks and citations omitted). That is the language

used in a litany of Mississippi cases. *See id.* (collecting cases). The question then becomes, how does one prove the purpose an officer had in mind when they instituted a prosecution? Malice, after all, "is a mental state." *Owens v. Kroger Co.*, 430 So. 2d 843, 847 (Miss. 1983).

The Mississippi Supreme Court has provided the answer.

"The ordinary and popular meaning of malice is usually associated with anger, hatred, ill will, and the like," that court has written, "but malice in fact and malice in law are not to be confused." *Harvill v. Tabor*, 128 So. 2d 863, 864 (Miss. 1961). In the legal context, "[m]alice does not refer to mean or evil intent." *Strong v. Nicholson*, 580 So. 2d 1288, 1293 (Miss. 1991).

Instead, the Mississippi Supreme Court has consistently held that "[m]alice can be inferred from the fact that a defendant may have acted with reckless disregard for a plaintiff's rights." *Bankston v. Pass Rd. Tire Ctr., Inc.*, 611 So. 2d 998, 1006 (Miss. 1992) (citing *Strong*, 580 So. 2d at 1293); *see also Nassar v. Concordia Rod & Gun Club, Inc.*, 682 So. 2d 1035, 1046 (Miss. 1996); *Benjamin v. Hooper Elect. Supply Co.*, 568 So. 2d 1182, 1191 (Miss. 1990). The court tells us that "[m]alice may be and usually is shown by circumstantial evidence." *Strong*, 580 So. 2d at 1293 (collecting cases). And it "has emphasized that since the question of malice is a question of fact, it is to be *determined by the jury* unless only one conclusion may reasonably be drawn from the evidence." *Benjamin*, 568 So. 2d at 1191 (citations omitted and emphasis in original).

This definition is satisfied here. Green describes several ways in which Detective Thomas acted with reckless disregard for his rights. For one, she pointed out Green to Jennings in a photo lineup after Jennings had identified someone else as the

killer. Jennings made a sworn statement attesting to such. *See* Docket No. 1-1. Steering an informant to make a false identification could not have been in the interest of "bringing criminal offenders to justice." *Oliver*, 235 So. 3d at 83. In fact, courts have found identifications unduly suggestive when they "steer[] the witness to one suspect or another, independent of the witness's honest recollection." *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001) (citation omitted).

Green's claim is buttressed by other circumstantial evidence of reckless disregard. He says Detective Thomas ignored and failed to inquire into obvious inconsistencies between Jennings' statement and the police reports she had in hand. *See* Docket No. 18 at 6. It would be impossible, he says, to credit Jennings' statement that Green moved the victim's body *and* honor the police report indicating that the victim was alive when discovered. Detective Thomas then withheld from the grand jury the holes that cast doubt on Jennings' reliability and Green's culpability. These are "facts of the case" from which a jury can infer malice. *Benjamin*, 568 So. 2d at 1191 (citation omitted).

The order of events may also indicate malice. If the detective steered Jennings to make a false identification *before* she presented Jennings' evidence to the grand jury, her acts might be probative of an intent to mislead the grand jurors.

Granting reasonable inferences in Green's favor, as the Court must at this stage, Detective Thomas acted with reckless disregard for Green's rights and may be subjected to discovery on the malice element.

Green has alleged malice in yet another way, too. In Mississippi, "absence of probable cause for the prosecution is

23

circumstantial evidence of malice." *Id.* (citing *Royal Oil Co., v. Wells*, 500 So. 2d 439, 444 (Miss. 1986)); *see Brown v. Watkins*, 56 So. 2d 888, 891 (Miss. 1952). As that is a separate element of malicious prosecution, however, and mindful of the fact that an absence of probable cause can support multiple aspects of Green's claims, the Court now moves on to discuss that issue.

### 2.      Lack of Probable Cause

Probable cause under Mississippi law requires the initiating law enforcement officer to concurrently have "(1) an honest belief on the guilt of the person accused, and (2) reasonable grounds for such belief." *Alpha Gulf Coast, Inc. v. Jackson*, 801 So. 2d 709, 722 (Miss. 2001) (quotation marks and citations omitted); *see also Royal Oil*, 500 So. 2d at 443. "Unfounded suspicion and conjecture are not proper bases for finding probable cause." *Benjamin*, 568 So. 2d at 1190 (citation omitted).

Detective Thomas does not identify how Green has failed to sufficiently plead one or both prongs of this standard. Instead, she reiterates that the grand jury's finding of probable cause forecloses this claim. *See* Docket No. 10 (raising the "independent intermediary" doctrine). The Court devotes much time to this objection below. *See infra* at Part IV.D. At this juncture, though, the Court assesses whether Green has sufficiently alleged a lack of probable cause under Mississippi law.

It is difficult to know what to do with the first element: the officer's "honest belief" in the accused's guilt. Green posits that Detective Thomas could not have believed in his guilt, because she steered a pliable informant to Green's face in the photo lineup. *See* Docket No. 18 at 9. On the other hand, maybe she steered the informant toward Green precisely

24

because she believed so deeply in Green's guilt. For her own part, Detective Thomas does not advance an argument regarding her "honest belief" in Green's guilt.

Even if we were to credit this element in her favor and assume that Detective Thomas genuinely believed Green was guilty, Green has alleged facts to proceed on the second element—that Detective Thomas's belief was objectively unreasonable. Green's allegations regarding the contradictions between Jennings' statement and the available evidence support an "absence of probable cause" by demonstrating that "a reasonable person would investigate further before instigating a proceeding." *Benjamin*, 568 So. 2d at 1191.

A final observation is owed here. A significant number of Mississippi cases concerning malice and probable cause are resolved at later stages of litigation, when courts can review the evidence. *See id.* at 1192 (ordering a new trial after considering evidence of "a senseless prosecution initiated . . . in a reckless manner"); *Royal Oil*, 500 So. 2d at 443 (affirming jury verdict finding malicious prosecution); *Owens*, 430 So. 2d at 844 (reinstating a jury verdict of malicious prosecution); *Oliver*, 235 So. 3d at 77 (considering the evidence gathered at summary judgment); *Harvill*, 128 So. 2d at 864 (vacating defense verdict and remanding for new trial). The weight of the authorities suggest that this Court should proceed with caution at the motion to dismiss stage and decline to make determinations that may be better resolved on the evidence.[22]

---

[22] For that matter, Mississippi Supreme Court cases suggest caution at the summary judgment stage, too. *See Benjamin*, 568 So. 2d at 1190 (vacating directed verdict and remanding for jury trial); *Brown v. Watkins*, 56 So. 2d

For these reasons, and subject to the independent intermediary defense to be discussed below, Green has sufficiently pled a malicious prosecution claim under Mississippi law.

### B.        Fourth Amendment Claims

The Fourth Amendment to the Constitution is one sentence long. It says:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Amendment is meant "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967).

Green brings two kinds of Fourth Amendment claims. One is for malicious prosecution, and the other is for false arrest.

### 1.        Malicious Prosecution

The Supreme Court recently reaffirmed that persons may bring a standalone Fourth Amendment malicious prosecution claim under the Ku Klux Klan Act. *See Thompson v. Clark*, 596 U.S. 36, 42 (2022) (collecting cases). The Court cited *Winfrey v. Rogers*, 901 F.3d 483, 492-93 (5th Cir. 2018) as an example of such a claim. Given *Winfrey*, it was clearly established in 2020

---

888, 891 (Miss. 1952) (endorsing trial court's decision to let jury determine malice and probable cause).

that Green had a right to be free from the initiation of wrongful criminal proceedings without probable cause.[23]

The *Thompson* decision clarified two minimum requirements of federal malicious prosecution claims. The first is that "the malicious prosecution resulted in a seizure of the plaintiff." 596 U.S. at 43 n.2 (citation omitted). The second is the "favorable termination" element of a common law malicious

---

[23] The federal right to be free from malicious prosecution has a peripatetic history in this circuit. *See Gordy v. Burns*, 294 F.3d 722, 725 (5th Cir. 2002) (describing Fifth Circuit caselaw on this topic as "confused and confusing"). The Court documents its development briefly.

The Fifth Circuit used to formally recognize a federal malicious prosecution claim as "coextensive" with "the elements of the state-law tort of malicious prosecution." *Id.* (citation omitted). In 2003, though, the en banc court overruled this holding, finding that "malicious prosecution states no constitutional claim." *Castellano v. Fragozo*, 352 F.3d 939, 953 (5th Cir. 2003) (en banc).

Despite this headline, *Castellano* went on to say that "[t]he initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example." *Id.* And later Fifth Circuit cases cited this language to recognize a right to be free from the wrongful initiation of criminal proceedings when they run in conjunction with an unreasonable seizure – sometimes even calling it or analogizing it to "malicious prosecution." *See Hernandez v. Terrones*, 397 F. App'x 954, 966 & n.5 (5th Cir. 2010); *Good v. Curtis*, 601 F.3d 393, 401 (5th Cir. 2010); *Winfrey*, 901 F.3d at 492-93; *Morgan v. Chapman*, 969 F.3d 238, 245-46 (5th Cir. 2020) ("In so far as the defendant's bad actions (that happen to correspond to the tort of malicious prosecution) result in an unreasonable search or seizure, those claims may be asserted under § 1983 as violations of the Fourth Amendment.").

Thus, no matter how it is labeled, there is a clearly established right in this circuit to be free from the wrongful initiation of criminal proceedings that result in a seizure.

prosecution claim, which has already been addressed above.[24]
*Id.* at 44. "The Supreme Court did not, however, lay out a
comprehensive list of the elements for a Fourth Amendment
malicious prosecution claim, and largely left the question of
elements to the lower courts." *Armstrong v. Ashley*, 60 F.4th
262, 278 (5th Cir. 2023).

Picking up on this instruction, the Fifth Circuit subsequently
clarified the remaining elements of a federal malicious prose-
cution claim. *Id.* at 279. It decided to reinstate earlier circuit
precedent and require plaintiffs to prove the traditional six el-
ements of a common law malicious prosecution claim. *Id.*

The bottom line is, in this circuit, a plaintiff pleading a federal
malicious prosecution claim under the Ku Klux Klan Act
must now allege seven elements: the six traditional malicious
prosecution elements used in Mississippi law, *id.,* and a sei-
zure, *Thompson*, 596 U.S. at 43 n.2.

The parties agree that Green was seized when he was arrested
and jailed. Docket No. 1 at 6. And we need not revisit Green's
factual allegations in support of the six state-law malicious
prosecution elements. Based on the resolution of those ele-
ments in his favor, and again subject to the discussion about
independent intermediaries, Green has plausibly stated a fed-
eral malicious prosecution claim.

---

[24] This element "does not require the plaintiff to show that the criminal
prosecution ended with some affirmative indication of innocence. A plain-
tiff need only show that the criminal prosecution ended without a convic-
tion." *Thompson*, 596 U.S. at 49.

## 2.    False Arrest / Illegal Detention

Green alleges several times that Detective Thomas caused his "wrongful arrest" without probable cause. Docket No. 1 at 5-7. It is not clear whether he intends this as a separate cause of action, or if this is an allegation that goes toward his Fourth Amendment claim for malicious prosecution. Out of an abundance of caution, the Court turns to this claim now.

"There can be no doubt" that the right to be free from arrest absent probable cause was clearly established at the time of Green's arrest. *Alexander v. City of Round Rock*, 854 F.3d 298, 306-07 (5th Cir. 2017) (collecting cases); *see Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994). The issue is whether Green has sufficiently pleaded facts showing that Detective Thomas violated this right.

"To prevail in a § 1983 claim for false arrest, a plaintiff must show that . . . the officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime." *O'Dwyer v. Nelson*, 310 F. App'x 741, 745 (5th Cir. 2009) (cleaned up).[25] "Probable cause is established by facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Arizmendi v.*

---

[25] The Fifth Circuit has at times articulated this differently, writing that "plaintiffs must allege facts permitting an inference that defendants lacked arguable (that is, reasonable but mistaken) probable cause for the arrests." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 207 (5th Cir. 2009) (citations omitted). Green's false arrest claim survives either articulation of the standard.

*Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quotation marks and citation omitted).

As Green points out, the "totality-of-the-circumstances" test for probable cause requires considering the reliability, credibility, and value of an informant's tip. Docket No. 18 at 5-6 (quoting *Illinois v. Gates*, 462 U.S. 213 (1983)). The Supreme Court has "consistently recognized the value of corroboration of details of an informant's tip by independent police work" and "reasonabl[e] corroborat[ion] by other matters within the officer's knowledge." 462 U.S. at 241-42 (quoting *Jones v. United States*, 362 U.S. 257, 269 (1960)). Indeed, judges in this circuit instruct juries that testimony of an informant seeking money, immunity, or personal advantage "must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses." Fifth Circuit Pattern Jury Instructions (Criminal Cases) 1.15 (2019). Jurors are advised that a defendant should never be convicted "upon the unsupported testimony of such a witness" unless that testimony is believed beyond a reasonable doubt. *Id*.

An eyewitness identification cannot establish probable cause if "there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection." *United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001) (citations omitted). A Fourth Amendment false arrest and illegal detention claim is further buttressed if the officer has conducted a reckless investigation. *See Hernandez v. Terrones*, 397 F. App'x 954, 965-66 (5th Cir. 2010).

"Where a plaintiff makes no allegation that the subject defendant actually arrested or detained him, the defendant will only be liable if his allegedly wrongful action was causally

connected to the plaintiff's arrest and detention.'" *Mayhew v. Johnson*, No. 1:21-CV-141-SA-DAS, 2022 WL 3271087, at *7 (N.D. Miss. Aug. 10, 2022) (cleaned up). This is a common law proximate cause standard. *Id.*

Taking Green's allegations and the available evidence as true, Detective Thomas could not have relied on Jennings' statement or photo lineup identification to reasonably believe that probable cause existed.

Jennings' statement is at times incoherent and at other times inconsistent. If Green didn't know that Jennings was in the room, for example, Green could not have told Jennings that he shot Robertson. Green further urges the Court to reasonably infer that Detective Thomas's personal interactions with Jennings, his admittedly drug-impaired demeanor, and his known criminal history put her on alert about his unreliability. *See* Docket No. 18 at 5. Taking the facial incredulity of Jennings' statement together with these circumstances, it would be patently unreasonable for a prudent police officer or an officer of reasonable caution to end the probable cause inquiry there. Yet Detective Thomas didn't corroborate Jennings' information. When Jennings' statement was finally revealed to be a lie, in fact, presumably the prosecution had nothing else to stand on; thus the District Attorney's Office dismissed the indictment.

Detective Thomas asserts that Green's complaint is too vague. The "only allegation" about her in the complaint, she claims, "is that she obtained a statement from Jennings implicating

Plaintiff Green in the murder of Robertson," and therefore the grand jury's indictment protects her.[26] Docket No. 10 at 7.

Critically, however, Detective Thomas does not contend that Jennings' statement, either alone or in combination (or, as the case may be, in contradiction) with any of the other evidence available to the police at the time, was enough to establish probable cause. The allegations and available evidence indicate that it was not. The police already had evidence that the deceased's body had not been moved and that Green had not been with the deceased shortly before his death. Docket No. 1 at 3-4. This contradicted Jennings' statement, meaning it was not "reasonably corroborated by other matters within [Detective Thomas's] knowledge." *Jones*, 362 U.S. at 269. Yet Detective Thomas recklessly ignored the reliability and credibility of Jennings' statement, used it, and withheld contradictory evidence from the grand jury, Green contends, causing his false arrest and illegal detention. She is not eligible for qualified immunity on this claim. *Accord Hughes v. Garcia*, --- F.4th ---, No. 22-20621, 2024 WL 1952868, at *7 (5th Cir. May 3, 2024).

### C.     Fourteenth Amendment Claim

Green's complaint asserts that Detective Thomas violated the Fourteenth Amendment. Docket No. 1 at 7. As before, it is not entirely clear whether he intends this as a standalone cause of action or, perhaps, a backstop in the event his Fourth Amendment claims fail. In an attempt to unwind the different legal theories at stake, the analysis first addresses whether Green has sufficiently pled a Fourteenth Amendment violation,

---

[26] To reiterate, the Court discusses the independent intermediary doctrine below in Part IV.D.

before tackling whether, if so, Green can bring such a claim at this stage.

A long line of Fifth Circuit cases clearly establishes a due process right to be free from police misconduct—in the form of evidence fabrication, witness interference, or concealment of exculpatory evidence—that causes an unlawful arrest, detention, or conviction. For example, a police officer violates the Constitution if she "procures false identification by unlawful means or deliberately conceals exculpatory evidence*." Geter v. Fortenberry*, 882 F.2d 167, 170 (5th Cir. 1989) (quotation marks and citation omitted) [hereinafter *Geter II*]. A police officer also violates the Constitution if she knowingly "unlawfully influenc[es] witnesses." *Good v. Curtis*, 601 F.3d 393, 398 (5th Cir. 2010) (citations omitted). In keeping with these decisions, and after surveying its sister circuits, in 2015 the Fifth Circuit reaffirmed "a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person." *Cole v. Carson*, 802 F.3d 752, 771 (5th Cir. 2015) [hereinafter *Cole I*], *vacated sub nom. Hunter v. Cole*, 580 U.S. 994 (2016), and *opinion reinstated in part*, 905 F.3d 334, 342 (5th Cir. 2018).

Given these cases, this Court is satisfied that the Fourteenth Amendment right allegedly violated by Detective Thomas was clearly established in 2020. It proceeds to assess whether Green's factual allegations on this claim are sufficient.

Again, Green alleges that Detective Thomas secured an unbelievable statement from a high, mentally-ill jailhouse informant; did not corroborate the informant's statement; withheld from the grand jury facts about that informant's impairments, criminal history, and incentives; withheld from the grand jury a police report with evidence about the victim's death that

33

contradicted the informant's statement; withheld from the grand jury evidence that another person had been with the victim before his death; and procured a false identification by pointing out Green's photo in the lineup to the informant, after the informant initially selected another person's photo.

These factual allegations echo those made in cases where a Fourteenth Amendment violation was stated. *See Geter II*, 882 F.2d at 170 (denying summary judgment where officer "prodd[ed] the witnesses to select another picture when they had chosen incorrectly" and concealed exculpatory evidence); *Good*, 601 F.3d at 398-400 (denying summary judgment where officer manipulated plaintiff's photo in a lineup to produce a false identification); *Burroughs v. City of Laurel, Miss.*, No. 2:19-CV-48-KS-MTP, 2019 WL 4228438, at *6-7 (S.D. Miss. Sept. 5, 2019) (denying motion to dismiss where officers allegedly "fabricated, misrepresented, and manipulated evidence and reports—including the intentional omission of exculpatory evidence—during their investigation and in their pursuit of an arrest warrant and indictment"). Given these cases, Green's allegations and attached evidence plead a Fourteenth Amendment due process violation that caused an unlawful arrest and detention. *See* Docket No. 1-1.

Now for the wrinkle. In *Cole I*, the Fifth Circuit seemed to suggest that Fourteenth Amendment claims based on evidence fabrication or withholding exculpatory evidence were limited to circumstances where the Fourth Amendment was "unavailing." 802 F.3d at 772. It is therefore not entirely clear whether Green can maintain a Fourteenth Amendment claim, since he has viable Fourth Amendment avenues of relief.

District courts have interpreted *Cole I* in different ways. Some have recognized a Fourteenth Amendment due process claim

34

for pretrial deprivation only when a Fourth Amendment claim was unavailable. *See McLean v. Davis*, No. 3:22-CV-33-DPJ-FKB, 2023 WL 1868192, at *4 (N.D. Miss. Feb. 9, 2023) (collecting cases). Others have allowed Fourteenth Amendment due process claims to proceed alongside Fourth Amendment false arrest or malicious prosecution claims. *See Thorpe v. WMS Gaming, Inc.*, No. 3:16-CV-147-NBB-RP, 2018 WL 4621906, at *4-5 (N.D. Miss. Sept. 26, 2018); *Ducksworth v. City of Laurel, Miss.*, No. 2:20-CV-114-KS-MTP, 2021 WL 4504692, at *6-8 (S.D. Miss. Oct. 1, 2021), *appeal dismissed sub nom. Ducksworth v. Landrum*, 62 F.4th 209 (5th Cir. 2023). Certainly, pre-*Cole I* courts allowed the differing Constitutional claims to proceed to trial, noting no conflict between them. *See Good*, 601 F.3d at 398-402.

This Court could not identify binding authority on how a district court should address these legal theories at the motion to dismiss stage. As Chief Judge Jordan put it in *McLean*,

> *Cole [I]* never says dismissal [of the Fourteenth Amendment claim] is appropriate if the plaintiff fails to plead facts showing the Fourth Amendment claim is unavailing. Instead, the court affirmed dismissal of the Fourth Amendment claim (because it failed to state a claim) and then allowed the Fourteenth Amendment claim to go forward because the Fourth Amendment claim was unavailing. The real question – and one *Cole [I]* does not address – is when a court must make that call.

2023 WL 1868192, at *5.

*McLean* involved factual circumstances resembling our case. There, the plaintiff alleged that the defendant either intentionally fabricated an autopsy report or recklessly prepared it in a way that caused the plaintiff's arrest and detention without probable cause, in violation of the Fourth and Fourteenth Amendments. *Id.* at *2. Chief Judge Jordan observed that Federal Rule of Civil Procedure 8 permits plaintiffs to set forth alternative theories of recovery. *Id.* at *5-6. He further considered *Morgan v. Chapman*, a Fifth Circuit case which allowed a plaintiff to plead both a Fourth Amendment and a Fourteenth Amendment claim. *Id.* (citing 969 F.3d 238, 250 (5th Cir. 2020)). Given these authorities, Chief Judge Jordan let the plaintiff move forward. *Id.*

Finding this reasoning persuasive, the Court concludes that Green can pursue alternative theories under the Fourth and Fourteenth Amendments.

### D.    Independent Intermediary Doctrine

Detective Thomas avers that the independent intermediary doctrine shelters her from liability on all of Green's claims.[27] Docket No. 10 at 6-9. Relying on *Craig v. Dallas Area Rapid Transit Authority*, 504 F. App'x 328 (5th Cir. 2012) and *Buehler v. City of Austin/Austin Police Department*, 824 F.3d 548 (5th Cir. 2016), she argues that the complaint lacks specific allegations regarding what was improperly presented to or misled the grand jury. *Id.* at 6-7. Green disagrees and illustrates various ways persons in this circuit overcame the insulation from

---

[27] *Good v. Curtis* applied (but expressly did not extend) the independent intermediary doctrine to Fourteenth Amendment claims. 601 F.3d at 400.

liability that results when an independent intermediary, such as a grand jury, finds probable cause. Docket No. 18 at 12.

"Under the independent-intermediary doctrine, if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for the Fourth Amendment violation." *Winfrey*, 901 F.3d at 496 (cleaned up). The doctrine does not apply, however, "if it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant." *Caudra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010) (cleaned up).[28]

A law enforcement officer taints grand jury deliberations when she "withhold[s] any relevant information." *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988). "Any misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior." *Id.*

Plaintiffs in this situation must specifically allege that the officer "deliberately or recklessly provided false information to . . . the grand jury" or made "knowing and intentional omissions that result in a warrant being issued without probable cause." *Anokwuru v. City of Hous.*, 990 F.3d 956, 964 (5th Cir. 2021) (citations omitted). In *Wilson v. Stroman*, for example, plaintiffs sufficiently alleged "taint" when they stated that

---

[28] The independent intermediary doctrine is also the subject of criticism. One scholar argues that it "is not rooted in the history of civil rights law--proximate cause is--and therefore, is not a valid defense to a civil rights claim." Amanda Peters, *The Case for Replacing the Independent Intermediary Doctrine with Proximate Cause and Fourth Amendment Review in § 1983 Civil Rights Cases*, 48 Pepp. L. Rev. 1, 5 (2021) (citation omitted). Professor Peters collects cases from across the country endeavoring to apply the doctrine, and from them concludes that "this area of law is a mess." *Id.* at 8.

officials (1) made material omissions and misrepresentations to the grand jury, and (2) withheld from the grand jury video evidence that undermined probable cause. 33 F.4th 202, 212-13 (5th Cir. 2022).[29]

"At the pleading stage, mere allegations of taint may be adequate to survive a motion to dismiss where the complaint alleges other facts supporting the inference." *Id.* at 212 (cleaned up). The Fifth Circuit has explained its rationale in this way:

> Given that a general rule of secrecy shrouds the proceedings of grand juries, it is understandably difficult for a plaintiff to know what was said—or wasn't said—to the grand jury absent any form of discovery. While that reality doesn't excuse pleading requirements, it does mean that allegations about what was presented or omitted in the grand jury room will in some sense be speculative, which is why plaintiffs like the ones here will need to allege other facts supporting the inference of what they allege to have occurred in the grand jury room.

*Id.* (cleaned up); *see also Mayhew,* 2022 WL 3271087, at *10 n.7 ("a plaintiff may not at the initial stage of the litigation be privy to the facts supporting the taint exception, particularly when it involves secret grand jury proceedings.").

---

[29] Because there were nearly 100 plaintiffs in *Wilson,* the Fifth Circuit remanded the matter for the district court to determine which individual pleadings met this standard. 33 F.4th at 213.

Green satisfies this standard. Recall that his complaint specifically alleges that Detective Thomas maliciously[30] withheld from the grand jury facts about her jailhouse informant's impairments, criminal history, and circumstances; a police report with evidence about the victim's death that contradicted the informant's statement; and evidence that another person had been with the victim before his death—all of which would have undermined probable cause. Had she provided the grand jury with "full and complete information," Green alleges, he "would not have been indicted." Docket No. 1 at 3.

Green has more than allegations. As already discussed, the informant has sworn under oath that Detective Thomas procured a false identification by pointing to Green's photo in the lineup, after the informant had initially selected another person's photo. Docket No. 1-1. That evidence indicates that Detective Thomas intentionally and maliciously engaged in obvious misconduct in her pursuit of Green. If the false identification was secured prior to the grand jury's consideration, moreover, Detective Thomas gave the independent intermediary testimony from a man she knew to be untruthful.

To this, Detective Thomas advances the Fifth Circuit's decisions in *Craig* and *Buehler.* Neither case supports her point.

In *Craig*, the plaintiff had been arrested and indicted for tampering with evidence. 504 F. App'x at 331. After being acquitted at trial, she brought false arrest and malicious prosecution claims against the officers, claiming a violation of the Fourth Amendment, the Fourteenth Amendment, and Texas law. *Id.*

---

[30] With this allegation, Green indicates that Detective Thomas's conduct was, at a minimum, reckless.

Although Craig succeeded in her criminal case, her Ku Klux Klan Act suit failed. The Fifth Circuit assumed that the defendants lacked probable cause to pursue her. *Id.* at 332. Even so, at the summary-judgment stage, Craig lacked evidence that they had tainted the grand jury proceedings. Her assertion that a defendant had a personal vendetta against her was nothing more than "conjecture." *Id.*

*Craig* might be more relevant to our case when we reach summary judgment. It does not, however, support the notion that Green has failed to state a claim of a tainted grand jury.

Detective Thomas fares no better with *Buehler*. There, after reviewing the evidence put forth at the summary-judgment stage, the trial and appellate courts found no proof that the defendants made "knowing misstatements or omissions" to the grand jury. 824 F.3d at 555. The grand jury had in fact heard from Buehler and other witnesses favorable to him, and still returned an indictment. *Id.* at 556. As with *Craig*, *Buehler* suggests waiting until the evidence is in before adjudicating this issue.

This Court does not know the truth of Green's claims. All we have are his allegations, one piece of material evidence, and a thin state-court record of the criminal proceedings. At this early point in the litigation, though, the legal standard requires this Court to take Green's allegations as true and make reasonable factual inferences in his favor. *See Iqbal*, 556 U.S. at 678. Under that standard, and consistent with the substantive law on this subject, Green has sufficiently alleged that Detective Thomas tainted the independent intermediary and caused his wrongful detention.

40

### E.       The Constitutionality of Qualified Immunity

If the Fifth Circuit disagrees and grants qualified immunity on any of these claims, Green advances an alternative argument for moving forward against Detective Thomas. He contends that "the qualified immunity doctrine is unsound law" and a "misreading of the Civil Rights Act of 1871."[31] Docket No. 18 at 14-15.

This Court has written on this topic previously. *See Jamison v. McClendon*, 476 F. Supp. 3d 386 (S.D. Miss. 2020). So it should come as little surprise that the Court finds these arguments compelling.

---

[31] The argument is foreclosed by existing law, but Green must urge it here if he wishes to preserve his objection for appellate review.

Justices,[32] judges,[33] advocates,[34] and scholars[35] have long found fault with qualified immunity. Several of the more compelling critiques are summarized below.

_____

[32] *See Anderson v. Creighton*, 483 U.S. 635, 668 (1987) (Stevens, J., dissenting) (criticizing the doctrine as "a double standard of reasonableness which unjustifiably and unnecessarily upsets the delicate balance between respect for individual privacy and protection of the public servants who enforce our laws"); *Wyatt*, 504 U.S. at 170 (Kennedy, J., concurring) ("In the context of qualified immunity . . . , we have diverged to a substantial degree from the historical standards."); *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("our treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted"); *Ziglar v. Abbasi*, 582 U.S. 120, 159-60 (2017) (Thomas, J., concurring in part) ("Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choices that we have previously disclaimed the power to make. . . . In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Kisela v. Hughes*, 584 U.S. 100, 121 (2018) (Sotomayor, J., dissenting) (lamenting the Court's "one-sided approach to qualified immunity" that "tells officers that they can shoot first and think later, and . . . tells the public that palpably unreasonable conduct will go unpunished").

[33] *See Zadeh v. Robinson*, 928 F.3d 457, 474 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part) ("the judge-made immunity regime ought not be immune from thoughtful reappraisal."); *Reich v. City of Elizabethtown, Ky.*, 945 F.3d 968, 991 (6th Cir. 2019) (Moore, J., dissenting) (opposing holding "Fourth Amendment plaintiffs . . . to an impossibly high standard, where they must dredge up a mirror-image case (that happened to arise in this circuit, and happened to result in a decision by this court) to have any hopes of surviving a qualified-immunity challenge at summary judgment"); *Horvath v. City of Leander*, 946 F.3d 787, 801 (5th Cir. 2020) (Ho, J., concurring in part and dissenting in part) ("[T]here is no textualist or originalist basis to support a 'clearly established' requirement in § 1983 cases."); *Estate of Jones*, 961 F.3d at 673 ("Although we recognize that our police officers are often asked to make split-second decisions, we expect them to do so with respect for the dignity and worth

of black lives."); *Stewart*, 970 F.3d at 678 (Donald, J., concurring in part and dissenting in part) (describing a "seemingly endless struggle with applying the doctrine"); *Cox v. Wilson*, 971 F.3d 1159, 1165 (10th Cir. 2020) (Lucero, J., dissenting from the denial of rehearing en banc) ("the profound issues with qualified immunity are recurring and worsening. . . . By continuing to await addressing deep and troubling qualified immunity issues brought to our attention time and again, we are complicit . . . ."); *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1026 (9th Cir. 2020) (Hurwitz, J., concurring in part and dissenting in part) ("To be sure, the [Supreme] Court has reiterated that a prior case directly on point is not required, and that officials can still be on notice that their conduct violates established law even in novel factual circumstances. But much like Lucy of 'Charlie Brown' fame, the Court repeatedly yanks away the football when lower courts attempt to apply this language."); *Jefferson v. Lias*, 21 F.4th 74, 93 (3d Cir. 2021) (McKee, J., concurring) ("The paradox that has evolved is that the perceived need to defer to the split-second decisions of trained professionals that is endemic to the jurisprudence in [qualified immunity] has failed to recognize the collective judgments of those very professionals and their administrative and governing agencies."); *McKinney v. City of Middletown*, 49 F.4th 730, 758 (2d Cir. 2022) (Calabresi, J., dissenting) ("The Supreme Court should do away with this ill-founded, court-made doctrine"); *Manzanares v. Roosevelt Cnty. Adult Det. Ctr.*, 331 F. Supp. 3d 1260, 1293-94 & n.10 (D.N.M. 2018) ("Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way."); *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 697 n.6 (E.D. Cal. 2019) ("[T]his judge joins with those who have endorsed a complete re-examination of the doctrine which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases."); *Estate of Smart v. Cty. of Wichita*, No. 14-2111-JPO, 2018 WL 3744063, at *18 n.174 (D. Kan. Aug. 7, 2018) ("[T]he court is troubled by the continued march toward fully insulating police officers from trial—and thereby denying any relief to victims of excessive force—in contradiction to the plain language of the Fourth Amendment."); *Thompson v. Clark*, No. 14-CV-7349, 2018 WL 3128975, at *13 (E.D.N.Y. June 26, 2018) ("Case precedent and policy rationale fail to justify an expansive regime of immunity that would prevent plaintiff from proving a serious

constitutional violation."); Hon. Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219, 1244 (2015) (criticizing "a series of decisions not compelled by statute or precedent that has had the harmful, practical effect of limiting the ability of all persons to receive the protections of the Constitution."); Hon. Jon O. Newman, *Here's a better way to punish the police: Sue them for money*, Wash. Post (June 23, 2016) ("the defense of qualified immunity should be abolished"); Hon. Lynn Adelman, *The Supreme Court's Quiet Assault on Civil Rights*, Dissent (Fall 2017) ("The fact is that there is no persuasive legal basis for the doctrine."); Hon. James A. Wynn, Jr., *As a judge, I have to follow the Supreme Court. It should fix this mistake*, Wash. Post (June 12, 2020) ("Eliminating the defense of qualified immunity would improve our administration of justice and promote the public's confidence and trust in the integrity of the judicial system.").

[34] *See, e.g.*, Brief of Cross-Ideological Groups Dedicated to Ensuring Official Accountability, Restoring the Public's Trust in Law Enforcement, and Promoting the Rule of Law as Amici Curiae in Support of Petitioner, Baxter v. Bracey, 140 S. Ct. 1862 (2020) (No. 18-1287) 2019 WL 2370285 (advancing arguments of the American Association for Justice, Americans for Prosperity, Due Process Institute, Law Enforcement Action Partnership, Roderick & Solange Mac Arthur Justice Center, NAACP Legal Defense & Educational Fund, Inc., National Association of Criminal Defense Lawyers, Public Justice, R Street Institute, and Reason Foundation); Jay Schweikert, *Qualified Immunity: A Legal, Practical, and Moral Failure*, Cato Inst. (Sept. 14, 2020); Ed Yohnka et al., *Ending Qualified Immunity Once and For All is the Next Step in Holding Police Accountable*, Am. Civ. Lib. Union (Mar. 23, 2021).

[35] *See, e.g.*, Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 14 (2017); Baude, 106 Calif. L. Rev. at 45; Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018); Karen M. Blum, *Qualified Immunity: Time to Change the Message*, 93 Notre Dame L. Rev. 1887 (2018); Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. Chic. L. Rev. 605 (2021); Enright & Geary, 13 Geo. J. of L. & Mod. Critical Race Persps. at 135; Nyla Knox, *Qualified Immunity: Rectifying A*

### 1.      The Textual Problem

"Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). In 1871, Congress exercised this authority—confronting the persistent problem of violent white supremacy—when it passed into law the Ku Klux Klan Act.

Qualified immunity, however, does not appear in the text of the Ku Klux Klan Act. It is not found in any Constitutional provision or other statute. Nor does it "help give . . . life and substance" to the "specific guarantees in the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (citation omitted). The defense has the opposite effect. It nullifies the guarantees of the Bill of Rights.

The doctrine's components are similarly untethered to any authority. Justice Thomas has observed several times that the clearly established test "cannot be located in § 1983's text." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting the denial of certiorari). An officer's right to immediately appeal the denial of qualified immunity was invented in 1985. *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). And the requirement that "existing precedent must have placed the statutory or constitutional question beyond debate"? The

---

*Detrimental Doctrine*, 53 Ariz. St. L.J. 945 (2021); Fred O. Smith, Jr., *Beyond Qualified Immunity*, 119 Mich. L. Rev. Online 121, 123 (2021); Wright et al., 126 Dickinson L. Rev. at 717; Teressa Ravenell, *Unincorporating Qualified Immunity*, 53 Loy. U. Chi. L.J. 371 (2022); *see also* Joanna Schwartz, Shielded: How the Police Became Untouchable (2023).

Supreme Court came up with that in 2011. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Not long ago, a plaintiff could satisfy the clearly established requirement by pointing to "a consensus of cases of persuasive authority." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). *Al-Kidd* changed that too. It required plaintiffs to identify a "robust" consensus of cases clearly establishing the law. 563 U.S. at 742. Today, it is not clear that a robust consensus is enough. The Supreme Court has suggested that only *its* precedent can establish the law. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 591 n.8 (2018).[36]

Governments "deriv[e] their just powers from the consent of the governed." The Declaration of Independence para. 2 (U.S. 1776). But the People never enshrined qualified immunity in the Constitution. Our representatives in Congress never put it into the statute or voted for it. No President signed it into law. If anything, it represents a kind of "trickle-down" democratic legitimacy.

Some might say that every legal doctrine has this flaw. It is a fair point, so we should be precise about the critique.

Legal doctrines fall upon a spectrum of democratic legitimacy, rather than a binary. Some try to implement statutes

---

[36] Professor Davidson spots another slight-of-hand in *al-Kidd*. He observes that "the Court altered the test from . . . 'a reasonable official would understand that what he is doing violates that clearly established right' to '*every* reasonable official would have understood that what he is doing violates that right.' Though the Court did not explain this alteration, later opinions have picked up on *al-Kidd*'s modification." Adam A. Davidson, *Procedural Losses and the Pyrrhic Victory of Abolishing Qualified Immunity*, 99 Wash. U.L. Rev. 1459, 1471 (2022) (cleaned up).

even-handedly. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 313-15 (5th Cir. 2008) (en banc) (reconciling the public- and private-interest factors of *forum non conveniens* with 28 U.S.C. § 1404(a)). Others seek to promote democratic values: abstention promotes federalism, prudential standing is meant to enforce Article III of the Constitution, and so on.

Qualified immunity is different. It adjudicates cases—it ends them—rather than channel them into a better forum brought by parties with a more concrete stake in the outcome. It is so removed from the democratic process that it merits the most stringent scrutiny.

Legal doctrines have a role in the judiciary. As the Supreme Court has recognized in another doctrinal context, though, they should not be imposed at the cost of "shirking the solemn responsibility of the federal courts to guard, enforce, and protect every right granted or secured by the constitution of the United States." *Kusper v. Pontikes*, 414 U.S. 51, 55 (1973).[37] It is difficult to see how qualified immunity survives that logic.

## 2.    The Counter-textual Problem

One of Green's more interesting arguments against qualified immunity lies at the intersection of the statute's textual and historical critiques.

Green points to new research suggesting that when Congress enacted the Ku Klux Klan Act, it "adopted explicit text that displaced common law defenses," making clear "that such a claim would be viable notwithstanding 'any such law, statute,

---

[37] For an important discussion of abstention's role in enforcing constitutional rights, *see* Fred O. Smith, Jr., *Abstention in the Time of Ferguson*, 131 Harv. L. Rev. 2283 (2018).

ordinance, regulation, custom, or usage of the State to the contrary.'" Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 207 (2023) (quoting An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes, 17 Stat. 13 (1871)). Professor Reinert says a government official omitted this text when he "published the first compilation of federal law in 1874." *Id.* If this is true, we've all been applying the wrong version of the statute.

Federal judges have taken note. In *Rogers v. Jarrett*, Judge Willett described this line of attack as a "game-changing argument[] . . . in this text-centric judicial era when jurists profess unswerving fidelity to the words Congress chose." 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring). If Professor Reinert is correct, he added, it would "supercharge[] the critique that modern immunity jurisprudence is not just *a*textual but *counter*textual. That is, the doctrine does not merely *complement* the text—it brazenly *contradicts* it." *Id.* at 980-81.[38]

No decisive judgment has been returned on this line of inquiry. Hopefully the academic community will continue to investigate.

As we wait, it remains true that qualified immunity is the law of the land and commands respect under *stare decisis*. If the Supreme Court follows its most recent jurisprudence on that subject, though, qualified immunity might be with us for but a short time. The next section explains why.

---

[38] Judges Dennis, Elrod, Graves, Higginson, Ho, and Douglas have also noted Professor Reinert's arguments. *See Villarreal v. City of Laredo, Tex.*, 94 F.4th 374, 408 n.14 (5th Cir. 2024); *Jimerson v. Lewis*, 94 F.4th 423, 431 (5th Cir. 2024).

### 3.      The *Dobbs* Dilemma

In 2022, the Supreme Court upended 50 years of precedent and eliminated the Constitutional right to a pre-viability abortion. *Dobbs*, 597 U.S. at 215. Its reasoning in that case supports upending existing law here.

Opponents of qualified immunity advance many of the same kinds of arguments that opponents of abortion used. In both instances, the primary complaint was that the Supreme Court had disregarded authoritative texts and used "raw judicial power" to balance implied rights and interests. *Id.* at 268; *see Pierson*, 386 U.S. at 555. Opponents complained that the high Court "short-circuited the democratic process" and "necessarily declared a winning side" in a long-running social controversy. *Dobbs*, 597 U.S. at 269.

The arguments against qualified immunity are stronger than the arguments Petitioners presented in *Dobbs*. The People themselves already expressed the standards they expect of law enforcement when they ratified the Fourth Amendment and passed the Ku Klux Klan Act into law. "The very enumeration of the [constitutional] right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).[39] So it should be an easier leap of logic—

---

[39] This Court is fond of using this language in Second Amendment cases. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010); *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 23 (2022). Surely this principle has validity in other Constitutional cases, too. But to date, only Justice Thomas has wielded this language outside of Second Amendment cases. *See Luis v. United States*, 578 U.S. 5, 33 (2016) (Thomas, J., concurring).

and lesser expenditure of political capital—to conclude that qualified immunity "was egregiously wrong on the day it was decided." *Dobbs*, 597 U.S. at 268 (cleaned up).

One might argue that law enforcement officers are entitled to keep qualified immunity because they have planned their livelihoods around its existence. *See, e.g.*, Caroline Goggin, *NH police department under fire for listing 'qualified immunity' as job perk in recruitment post*, WHDH.com (Aug. 4, 2021). Judges and lawyers call this a "reliance interest." One judge has argued that because revisiting qualified immunity "would have significant consequences for state and local governments, . . . reliance interests recommend adherence to stare decisis." *McKinney v. City of Middletown*, 49 F.4th 730, 748 (2d Cir. 2022).

It was strange to see that argument after the Supreme Court's abortion decision, though, because *Dobbs* rejected precisely that kind of vague, "generalized assertion[] about the national psyche." 597 U.S. at 288. The Court instead thought voters should resolve reliance interests, not judges. After all, just like women, law enforcement officers and their unions "are not without electoral or political power,"[40] and may "seek to

---

[40] All understand the power and influence of the police. *See* Benjamin Levin, *What's Wrong with Police Unions?*, 120 Colum. L. Rev. 1333 (2020); Noam Scheiber et al., *How Police Unions Became Such Powerful Opponents to Reform Efforts*, N.Y. Times (June 6, 2020); Sam Blum, *Police Unions Wield Massive Power in American Politics—For Now*, Rolling Stone (July 7, 2020); Ross Barkan, *How Did Police Unions Get So Powerful?*, The Nation (July 2, 2020).

affect the legislative process by influencing public opinion, lobbying legislators, voting, and running for office." *Id.* at 288.[41,42]

*Dobbs* also reflects the Supreme Court's desire to remove itself from the center of a hot-button issue and return it to the electoral process. As one Justice remarked at oral argument in that

---

[41] It was just a few years ago that the Justices told us that "[t]he fact that public-sector unions may view" a constitutional decision "as an entitlement does not establish the sort of reliance interest that could outweigh the countervailing interest that nonmembers share in having their constitutional rights fully protected." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 927 (2018) (cleaned up).

[42] Defenders of the status quo are then left to argue that "[s]tare decisis 'carries enhanced force' when, as in the case of qualified immunity under § 1983, the relevant precedent 'interprets a statute.'" *McKinney*, 49 F.4th at 748 (quoting *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015)). But that doesn't go very far in a post-*Dobbs* world.

It is true that when the Court misinterprets a statute, Congress can step in and clarify the law. *E.g.*, *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), *overturned by* The Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2 (Jan. 29, 2009). Congress would be well within its rights to clarify or abolish qualified immunity.

The same fundamental principle was at stake in *Dobbs*, though. There, the Court could have deferred to the democratic process and let the voters overrule, amend, or expand *Roe v. Wade* through the passage of a Constitutional amendment. The Court nevertheless elected to fix its perceived mistake and overrule its interpretation of the law.

The point is this: the availability of a democratic remedy for qualified immunity doesn't stop the Supreme Court from taking responsibility for the problem it created. As Justice Thomas has written, "when we err in areas of judge-made law, we ought to presume that Congress expects us to correct our own mistakes—not the other way around." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 298 (2014) (Thomas, J., concurring).

case, when the Constitution is silent on such important interests, "why should this Court be the arbiter rather than Congress, the state legislatures, state supreme courts, the people being able to resolve this?" Transcript of Oral Argument at 107, Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) (No. 19-1392) (Kavanaugh, J.).

There is a certain appeal to this. Since the early 1970s, the Supreme Court issued more than 100 decisions referencing *Roe v. Wade*. Maybe that amount of controversy on issues of life and death, where passions run high, was too much for any person or institution to bear.

Over that same period of time, though, the Supreme Court has issued more than 200 decisions referencing qualified immunity. Many of those cases are also about life and death. *See Mullenix*, 577 U.S. at 9. Yet it has not yet seen fit to return this contested issue to the democratic process. It is not clear why.[43]

To all this, a layperson might wonder how such a shaky doctrine can be maintained. The next section will discuss the Justices' own explanations.

### 4.        The Policy Justifications

The Supreme Court says qualified immunity exists to protect government officials from "the expenses of litigation, the diversion of official energy from pressing public issues, and the

---

[43] The current Court is certainly not shy about overruling precedent. "In 2018, *Janus v. AFSCME* overruled *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977); in 2019, *Knick v. Township of Scott* overruled *Williamson County v. Hamilton Bank*, 473 U.S. 172 (1985); and in 2020, *Ramos v. Louisiana* overruled *Apodaca v. Oregon*, 406 U.S. 404 (1972)." *Jamison*, 476 F. Supp. 3d at 420. The category seems to grow every year. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).

deterrence of able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). "[E]ven such pretrial matters as discovery are to be avoided if possible, as inquiries of this kind can be peculiarly disruptive of effective government." *Mitchell*, 472 U.S. at 526 (cleaned up).

Pause for a moment to observe how aberrant these justifications are. Emergency room physicians are critical in a real life-or-death sense. But when they are sued for negligence, we take for granted that they will have to respond and, perhaps, be subjected to discovery about their actions. The economy relies on banks to preserve, grow, and allocate resources. In the event a bank engages in fraud or facilitates a Ponzi scheme, though, its victims can come to court and ask to be made whole.

The same is true for just about every realm of life. The judicial process is how our democracy provides "tribunals for the peaceful resolution of *all* manner of disputes." Chief Justice John G. Roberts, Jr., 2015 Year-End Report on the Federal Judiciary at 2 (emphasis added). So it is odd for the judicial process to privilege government over every other industry. It's important to keep the public sector functioning, to be sure, but we also need functional hospitals, utilities, financial institutions, and supply chains. And in all of those systems, we accept the costs and distractions of litigation as necessary consequences of a fair dispute resolution system.

The Supreme Court nevertheless assumes that qualified immunity is necessary to privilege government operations over non-government operations. Yet little to no evidence supports the assumption.

Professor Schwartz's research indicates that "qualified immunity is not achieving its policy objectives" and "may, in fact, increase the costs and delays associated with constitutional litigation." Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 11 (2017). One of her more galling findings reveals that officers are trained on "broad principles"— not the specific "factual scenarios" that appellate judges then insist were necessary predicates to liability. Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. Chi. L. Rev. 605, 610 (2021). "Officers could never learn the facts and holdings of the hundreds or thousands of cases that clearly establish the law and, even if they learned about some of these cases, they would not reliably recall their facts and holdings while doing their jobs." *Id.* at 612. And the notion that a government employee will change their behavior out of fear of personal liability is not borne out by the evidence. Police officers are not held financially responsible for the vast majority of settlements and judgments against them. Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1806 (2018).

At the end of the day, the Court's policy-based defense of qualified immunity is simply a choice to privilege government officials over all others. The justifications are less than persuasive.

### 5.      The Criminal Law Parallels

Our legal system believes that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quotation marks and citation omitted). We do not incarcerate a person unless a statute gives them

"fair warning" that a course of conduct is criminal. *Rogers v. Tennessee*, 532 U.S. 451, 457 (2001).

Qualified immunity is similar. The Supreme Court once admitted that "the 'clearly established' immunity standard . . . is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *United States v. Lanier*, 520 U.S. 259, 270-71 (1997).

Unfortunately, this reasoning reveals just how confused this doctrine is.

Criminal liability is *supposed to be* the most difficult form of accountability. That's because a criminal conviction results in loss of liberty—imprisonment—while civil liability results only in a transfer of money. Indeed, it's *supposed to be* harder to prove a violation of criminal law than it is to prove a civil claim. The Constitution protects you from criminal conviction unless there is *proof beyond a reasonable doubt of every fact* necessary to constitute the crime. *In re Winship*, 397 U.S. 358, 364 (1970); *see Mullaney v. Wilbur*, 421 U.S. 684, 701 (1975). In contrast, a civil judgment requires proof by only a preponderance of the evidence.

Given these distinctions, you can see that the Supreme Court never should have equated qualified immunity with criminal law. They are wholly different creatures.

But there is something else important going on. It concerns the level of generality at which the law holds people accountable.

In a criminal case, the government can convict and send you to prison even if no one had ever committed that crime in

quite the same way before. The prosecutor doesn't have to prove that the unlawfulness of your conduct was "beyond debate." You can lose your liberty for new and creative kinds of criming.[44] *See Lanier*, 520 U.S. at 268. Courts reject defendants' demands for advance notice of whether something is unlawful, because "it would not have been possible or practical for Congress to outline each of the many possible ways that a person might" commit a crime. *United States v. McCoy*, 539 F.2d 1050, 1058 & n.8 (5th Cir. 1976).

It's easy to see why. Society evolves, grows, changes. It makes sense for Congress to criminalize fraud no matter whether it's conducted via the Pony Express or Bitcoin. People are held accountable for violating a general principle: *don't defraud others*.

Qualified immunity turns this on its head. Under the doctrine, because "the clearly established law must be 'particularized' to the facts," we argue about whether precedent placed the unlawfulness of the officer's *specific factual scenario* "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation marks and citation omitted). Time and time again, the Justices reverse lower courts for "fail[ing] to identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *Id.* The result is a world where courts let prison officials get away with putting someone in a feces-covered cell for six days, rather than hold them accountable for violating the general principle: *don't make people sleep in other people's feces*.

---

[44] Merriam-Webster, *Words We're Watching: 'Criming'*, https://www.merriam-webster.com/wordplay/words-were-watching-criming-verb    (last visited May 13, 2024).

Consistency suggests that one of these two systems must change. If we value liberty as much as we say we do, perhaps the criminal law should refuse to convict someone unless the unlawfulness of their "particularized" conduct had already been held to be "beyond debate" at the time they acted. *Id.* Or, if it is qualified immunity to yield, we should define Constitutional rights at a higher level of generality, recognizing that we will never be able "to outline each of the many possible ways that a person might be said to" violate the Constitution. *McCoy*, 539 F.2d at 1058 n.8. But the two systems cannot coexist with any honesty. *It cannot be true* that in America, it is easier to take away one's liberty than hold the government accountable for violating the very Constitution guaranteeing that liberty.

### 6.    A More Democratic Vision[45]

This Judge has no say in the adjustment or abolition of qualified immunity. But having devoted several pages to critiquing the doctrine, I do feel some responsibility to spell out the principles I believe should guide any changes.

"We the People" elect the President—through the electoral college—every four years. We the People elect our Senators every six years and our Representatives every two years. And, although We the People don't vote on federal judges, we nevertheless exercise vast power in the judicial branch every day, through jury service.

Jurors are judges of the facts. They decide what happened, who's responsible, and whether there will be consequences.

---

[45] To be crystal clear, "democratic" here means small-d democracy, *not* the political party. The above footnotes show in detail the cross-ideological nature of the calls for qualified immunity reform.

They decide who to believe a little bit and who not to believe at all. They weigh evidence by the *preponderance* standard, the *clear and convincing* standard, and the *beyond a reasonable doubt* standard. Juries decide damages awards in civil cases from car wrecks to discrimination claims to billion-dollar intellectual property disputes. They decide guilt and innocence in criminal cases. Sometimes they even "express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).

To say that the judiciary is "undemocratic," then, is not the full story. The People enshrined in the Constitution the powers they would wield in the Third Branch.[46] Article III provides that "all crimes" shall be tried "by jury." The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." And the Seventh Amendment declares that all common law claims exceeding $20 must be decided by a jury.[47] The power is simply exercised one dispute at a time, day after day, rather than on fixed election days.[48]

---

[46] Note that while some amendments limit the power of judges, those limitations are not placed on juries. Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1190 (1991).

[47] The Seventh Amendment also applies "to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether*, 415 U.S. 189, 194 (1974).

[48] The role of the jury should not be surprising. Revolutionary Americans so objected to colonial administrators' "use of judge-tried cases to circumvent the right of civil jury trial" that all 13 original states provided for civil jury trials. Charles W. Wolfram, *The Constitutional History of the Seventh*

Judicial supremacy has too-often deprived the People of their proper role in deciding constitutional torts brought under the Ku Klux Klan Act. The doctrine of qualified immunity, as currently constructed, mistakenly lets judges quibble endlessly over whether a constitutional violation was "clearly established," "beyond debate," or "obvious."[49] All of this frustrates resolution by the People. The doctrine also errs in giving defendants unusual rights to take immediate appeals. These appeals not only deprive victims of their right to pursue evidence in the government's possession, but they allow more judges to perpetuate the tedious legal debate. It should not have taken more than seven years for Mr. Taylor—the Texas man housed in excrement—to secure judicial permission to take discovery from prison officials. But it did.

This area of law reflects a deep distrust of ordinary people. "The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, *or, it might be added, to that of the judiciary*." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343 (1979) (Rehnquist, J., dissenting) (emphasis added). Today, though, federal judges

---

*Amendment*, 57 Minn. L. Rev. 639, 654-55 (1973). "[T]he nascent American nation demonstrated at virtually every important step in its development that trial by jury was the form of trial in civil cases to which people and their politicians were strongly attached." *Id.* at 656.

[49] As this Opinion was going to press, the Fifth Circuit released a decision denying qualified immunity to police officers who engaged in "obviously" unconstitutional acts. *Hughes*, 2024 WL 1952868, at *1. The decision is commendable. Among other things, it collects Supreme Court cases to articulate "a simple, clearly established rule that all officers should know at all times . . . : Do not lie." *Id.* at *6 n.1. Whether this holding will survive en banc review or a Supreme Court petition is unknown.

"are increasingly willing to take ostensibly speculative or implausible claims from the jury by granting summary judgment in complex actions, actions turning on state of mind, or in cases involving concealed wrongdoing—a trend that has far-reaching tentacles." Andrew S. Pollis, *The Death of Inference*, 55 B.C. L. Rev. 435, 454 (2014) (cleaned up). This simply need not be.

This Court has seated juries for quite a few years now. They pay close attention to the facts. Wanting to follow the law, they ask questions about the substantive legal instructions they receive. Their deliberations take time, which can be agonizing, but we wait because it is the fairest way to settle our disputes. And regardless of whether a judge agrees with the verdict, in our democracy it is the jury's decision to make. In the same way we trust the collective judgment of voters in elections, we must trust the judgment of jurors in deciding cases.

Law enforcement cases are no different. I have seated juries that have found for and against law enforcement officers. The jurors know the difference between those acting properly and those violating others' rights. Their work confirms that when it comes to fact-finding, "anything a judge can do a jury can do better." *Marchan v. John Miller Farms, Inc.*, 352 F. Supp. 3d 938, 947 (D.N.D. 2018). "It takes a special type of arrogance simply to conclude that American jurors cannot." *Id.*

In Ku Klux Klan Act cases, as elsewhere, all we need to do is tell jurors the truth. We should tell jurors that law enforcement officers must sometimes "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). We all know that. We should also tell jurors that officials who

60

engage in a pattern of misconduct or act in a "calculated fashion" despite "months to consult legal counsel" are entitled to less deference. *Villarreal v. City of Laredo, Tex.*, 94 F.4th 374, 408 (5th Cir. 2024) (Willett, J., dissenting). It's just common sense.

We should instruct jurors that federal law gives people the right to be free "from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial." *Mitchum*, 407 U.S. at 242. At the same time, we should instruct them that unnecessary suits against public officers run the risk of diverting "energy from pressing public issues" and deterring "able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814.

These principles are in tension. It is true. The Constitution is full of those tensions. Its authors in one breath declared all men to be created equal, and in the other calculated a slave to be worth three-fifths of a white person. Contradiction is in America's DNA.

The judiciary should permit the People to resolve those tensions and contradictions case by case, as the evidence dictates. Only with that democratic participation will we "reinforce[] a fundamental belief . . . that we are all created equal and assure[] citizens that in our society even the powerful and wealthy are subject to the scrutiny of average citizens." Hon. Kathleen M. O'Malley, *Trial by Jury: Why It Works and Why It Matters*, 68 Am. U. L. Rev. 1095, 1109 (2019).

## V.    Conclusion

Desmond Green has suffered two injustices. The judiciary should not impose a third. If qualified immunity would do that, closing the courthouse doors to his claims, then the doctrine should come to its overdue end.

The motion to dismiss is denied. This case is stayed so that Detective Thomas can exercise her right to an immediate interlocutory appeal. If she declines to timely appeal, the case will proceed into discovery as to this defendant.

**SO ORDERED**, this the 20th day of May, 2024.

s/ CARLTON W. REEVES
*United States District Judge*

62